**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **ANGELA EVERSON RAY,** *Administrator of the Estate of Twyla M. Dillard, et al.*, | : | |
| **Plaintiffs,** | | Case No. 2:21-cv-4378 <br> **Judge Sarah D. Morrison** <br> **Magistrate Judge Chelsey M. Vascura** |
| v. | | |
| **ELAINE BRYANT,** *et al.*, | : | |
| **Defendants.** | | |

**OPINION AND ORDER**

For three weeks in the summer of 2019, Twyla Dillard was in limbo—medically and legally. She had been shot by her ex-boyfriend and then arrested on a months-old warrant for violating the civil protection order he had against her. The issuing court was never advised of the warrant's execution, but the Columbus Division of Police ("CDP" or the "Division") nonetheless considered her a "hospitalized prisoner." So Ms. Dillard lay in the hospital, under sedation and armed guard, until her death. Though the facts are indisputably disturbing, this Court can provide no redress.

The case—brought by Angela Everson Ray (as administrator of Ms. Dillard's estate), Dawn Thomas, and Earnest Dillard, II, against Elaine Bryant (as Division Chief), Officers Kenneth Sauer and Wayne Bryant, and Detectives Laurie Carney and Jeff Brandt—comes on cross-motions for summary judgment. For the reasons

set forth below, Defendants' Motion for Summary Judgment (Defs.' Mot. Summ. J., ECF No. 36) is **GRANTED** and Plaintiffs' (Pls.' Mot. Summ. J., ECF No. 41) is **DENIED**.

I. STATEMENT OF FACTS

The facts giving rise to this action are largely undisputed.

### A. On July 19, 2019, Twyla Dillard was shot by her ex-boyfriend.

When her parents passed away, Twyla Dillard inherited the family home on the outskirts of Columbus, Ohio. (Dawn Thomas Dep., ECF No. 36-1, 33:16–17.) She lived there with her sister, Dawn Thomas, and their dog. (*Id.*, 33:16–21.) Their brother, Earnest Dillard, II, lived nearby. (Earnest Dillard, II Dep., ECF No. 36-2, 8:15.)

Ms. Dillard was engaged in an 'on-again-off-again' relationship with Michael Jackson. (*See* Dillard Dep., 21:4–7.) The relationship was not a healthy one. (*See* Thomas Dep., 33:7–13.) In deposition, Ms. Thomas recalled that Ms. Dillard[1] and Mr. Jackson "were stalking each other." (Thomas Dep., 75:19–21.) Crucial to the present action, Mr. Jackson obtained a civil protection order against Ms. Dillard on June 16, 2016. (*See* ECF No. 36-6.) Mr. Jackson reported that Ms. Dillard violated the protection order and, on May 11, 2019, a warrant issued for her arrest. (*Id.*) *See also State v. Dillard*, No. 2019 CR B 008602 (Franklin Cty. Mun. Ct.).

---

[1] On March 8, 2018, a Franklin County jury found Ms. Dillard guilty of Menacing by Stalking and Attempted Burglary committed against Mr. Jackson. *See State v. Dillard*, No. 16 CR 002747 (Franklin Cty. Ct. C.P.). She was sentenced to a period of incarceration, satisfied by the nearly two years she spent in jail awaiting trial. *Id.*

In the early hours of July 19, 2019, Columbus Police Officers Kenneth Sauer and Wayne Bryant were dispatched to the scene of a reported shooting. (Kenneth Sauer Aff., ECF No. 36-3, ¶ 4.) When they arrived, the Officers approached a male matching a description given by the dispatcher:

> We exited our cruiser and asked him where the victim was. The male . . . , identified as MICHAEL JACKSON, . . . said, "She's over there." They asked Mr. Jackson where the shooter was and Mr. Jackson said, "I'm right here."

(ECF No. 36-5.) Ms. Dillard had been shot several times. (*Id.*) She was transported to Mt. Carmel East Hospital in critical condition. (*Id.*) Detectives Laurie Carney, Jeff Brandt, and Glen Bray were later assigned to the case. (ECF No. 36-13, PAGEID # 521.)

### B. Because there had been an outstanding warrant for her arrest, Ms. Dillard was placed under guard duty at the hospital.

Defendants state (and Plaintiffs do not refute[2]) that "[a]fter the warrant was verified, Miss Dillard was placed under arrest and a guard duty was established." (ECF No. 36-9, PAGEID # 476.) CDP Directive 4.02 governs the establishment of guard duty for all "Hospitalized Prisoners." (Directive 4.02, ECF No. 36-30.) Directive 4.02 provides that a "misdemeanant requiring hospitalization should be issued a summons," if permitted. (*Id.*) However, under a separate Directive, "a

---

[2] Although Plaintiffs first argue that the arrest was not perfected due to CDP's failure to notify the issuing court that the warrant had been executed (*see* Pls.' Mot. Summ. J., PAGEID # 732), they later concede that Ms. Dillard "had been formally arrested." (*See* ECF No. 45, PAGEID # 861, 864.)

3

summons is not permitted when the offense is a violation of protective order."[3] (ECF No. 36-9, PAGEID # 476.) As to Hospitalized Prisoners, Directive 4.02 provides:

> Division personnel shall not allow anyone to visit a hospitalized prisoner unless the prisoner is near death, or the prisoner has clearly requested to speak to an attorney. This should be determined by investigative unit personnel. In the event an attorney has been authorized, officers shall require identification from the prisoner's attorney that shows the individual is a practicing attorney.
>
> Immediate family may be permitted to visit the prisoner once Division personnel verify with the medical staff that the prisoner is in a near death condition. . . .

(Directive 4.02.) The Directive further requires the guarding officer to shackle the hospitalized prisoner to the bed and remain with the prisoner at all times. (*Id.*)

### C. Ms. Thomas and Mr. Dillard were told their sister had been shot, but her location was withheld.

Around 6:30 on the morning of July 19, Ms. Thomas returned home from her night-shift job as an analytical chemist. (Thomas Dep., 12:6, 12:18, 18:13–16.) Ms. Dillard was not home, and did not immediately respond to Ms. Thomas's texts. (*Id.*, 18:16–20.) Ms. Thomas noticed that Ms. Dillard's bike was gone. (*Id.*, 19:5.) By 7:30, she started to worry. (*Id.*, 19:21–22.) She called several area hospitals to see if Ms. Dillard had been injured in an accident. (*Id.*, 19:7–13.) With no word by 10:30, Ms. Thomas reported to CDP that Ms. Dillard was missing. (*Id.*, 23:3–9.)

That afternoon, Ms. Thomas, Mr. Dillard, and two friends took bikes to a nearby path to search for Ms. Dillard. (E. Dillard Dep., 16:12–19:4.) Mr. Dillard

---

[3] Although Directives 3.09 (Protection Orders) and 3.02 (Summons and Misdemeanor Citations) are referenced in written discovery responses, neither is included in the record. (*See, e.g.*, ECF No. 36-8, PAGEID # 470.)

4

called law enforcement for assistance. (*Id.*, 19:9–17.) While the others were searching, CDP met Mr. Dillard at the trailhead and revealed that they knew where his sister was. (*Id.*, 21:10.) Mr. Dillard recounted the conversation in deposition:

> The information I received from them was that she had been – that they knew where she was. And then when we pressed them, they were hesitant to give me information that she had been at his – at his house, and then basically they – they finally told us after some coaxing that she had been shot, but that she was alive, because we were concerned – the moment you hear someone's been shot, well, she's shot, what's her condition? Well, her condition at the moment is stable. Okay. Where is she at? I can't tell you. And I was asking why I couldn't be told where she was at. And they were trying to tell me that there were other circumstances and that they couldn't tell me.

(*Id.*, 21:17–22:7.) He was told only that Ms. Dillard and Mr. Jackson "had had some sort of altercation and that he had shot her," but "that she was alive and stable." (*Id.*, 22:18–23.)

### D. Ms. Dillard spent three weeks under guard at Mount Carmel East.

Though Ms. Dillard spent three weeks under guard at Mount Carmel East, there is very little evidence of what occurred during that time. What is available is summarized below.

A type-written note dated July 19, 2019, appears in the CDP file:

> Twyla M Dilliard [sic] currently has a warrant for F1[4] Violation of Protection Order #15CV10146 case #19-8602. The protected person is Michael L Jackson.
>
> Additional F1 VPO charges will be filed upon Ms Dillards' release.

---

[4] The Municipal Court docket indicates that the warrant was for an M1 offense. (*See* ECF No. 41-1, PAGEID # 750.) It is unclear what, if any, significance this error might have had.

> If there is any change in her condition (good or bad) contact DV Det. Carney #861 at x7225 or Homicide Det. J. Brandt #1784 x4730 to advise them.
>
> Should Ms. Dillard be release please contact DV Det. J. Ratliff #2026 x7225 prior to her being slated in order for her to be interviewed on the current VPO warrant.
>
> **\*\*absolutely no contact outside of medical personnel without approval from Det. Carney or Det. Brandt\*\***

(ECF No. 41-1, PAGEID # 747.) Several hand-written notes are also in the CDP file, including:

> 7/20/19 @ 2:00am
>
> Checked on victim at [Mount Carmel East] in Rm # 2N28. Per nurse still critical and likely to die, also just had surgery. Unknown if any projectiles found. Would turn in to security if any found. Det. Gribi #2023 also present.
>
> 7/20/19 @ 8:00pm
>
> Check on victim again. Condition still same. Still likely to die.

(*id.*, PAGEID # 748); and

> IF PATIENT EXPIRES, CALL DET.(S) ON THE LIST HERE. AND FAMILY IS ALLOWED SHOULD SHE EXPIRE

(*id.*, PAGEID # 749).

There is conflicting evidence in the record as to when (if ever), for how long, and to what extent, Ms. Dillard was conscious while in the hospital. Detectives Carney and Brandt each state they were unable to interview Ms. Dillard "due to [her] medical condition"—when they visited, Ms. Dillard was "unconscious or sedated." (ECF No. 36-13, PAGEID # 521, 524; ECF No. 36-14, PAGEID # 531, 533.) But medical records (to which no affiant has testified for authentication,

6

explanation, or otherwise) indicate that Ms. Dillard may have been alert on July 23 and July 27. (ECF No. 41-4, PAGEID # 809–11.) Ms. Thomas testified[5] that, for all but five or six hours of her hospitalization, Ms. Dillard was in a medically-induced coma. (Thomas Dep., 48:9–15.)

### E. CDP permitted family to visit Ms. Dillard on August 7, 2019. She died two days later.

At 2:00am on August 7, 2019, Detective Carney called Ms. Thomas to advise her that Ms. Dillard's medical condition had worsened, and that the family could visit her at Mount Carmel East.[6] (Thomas Dep., 36:8–12.) Ms. Thomas went to the hospital shortly thereafter. (*Id.*, 40:13–14.) Ms. Dillard died at 12:25pm on August 9, 2019. (ECF No. 36-10, PAGEID # 483.) Mr. Dillard was unable to visit before she passed. (E. Dillard Dep., 38:1–2.)

## II. PROCEDURAL BACKGROUND

Plaintiffs first filed this action on August 9, 2021, in the Franklin County Court of Common Pleas. (*See* ECF No. 3.) After Defendants removed the action to this Court, Plaintiffs filed the operative Amended Complaint. (Am. Compl., ECF No. 20.) Therein, Plaintiffs assert § 1983 claims for violation of Ms. Dillard's civil rights[7]; § 1983 claims for violation of Ms. Thomas and Mr. Dillard's civil rights; and

---

[5] Though there are significant evidentiary issues with this testimony, *see* Fed. R. Evid. 602 (Need for Personal Knowledge) and 801 (Rule Against Hearsay), Defendants raise no objection. (*See* Defs.' Mot. Summ. J, PAGEID # 245 (citing Ms. Thomas's testimony).)

[6] Plaintiffs dispute that there was any change in Ms. Dillard's medical condition, arguing that she had been in a near-death state since she was admitted. (Pls.' Mot. Summ. J., 3.)

[7] The Court recognizes that Ms. Ray, as administrator of Ms. Dillard's estate, is pursuing the claims alleging violation of Ms. Dillard's constitutional rights. To

7

state law claims for intentional infliction of emotional distress and violation of the duty of care and contributory negligence. (*Id.*, generally.)

With regard to the § 1983 claims, the Amended Complaint does not enumerate the constitutional provisions alleged to have been violated. Between the Amended Complaint and their Motion for Summary Judgment, however, Plaintiffs allude to or reference rights protected by the First, Fourth, Fifth, Sixth, and Fourteenth Amendments.[8] (*See* Am. Compl.; Pls.' Mot. Summ. J.) Regardless of the specific constitutional bases, the Amended Complaint is clear: Plaintiffs' claims are based on (i) the decision to restrict the family's ability to visit Ms. Dillard and (ii) the failure to timely notify the family about Ms. Dillard's shooting, medical condition, and location. (*See* Am. Compl.) Central to their claims is the argument that Division Directive 4.02 violated their constitutional rights.

---

avoid confusion, however, the Court will discuss those claims by reference to Ms. Dillard alone.

[8] Defendants argue that Plaintiffs allege new claims in their Motion for Summary Judgment. (ECF No. 43, PAGEID # 824.) Plaintiffs dispute that assertion, arguing that they "were merely expanding on the civil rights violations that were plead [sic] and inferenced in the amended complaint and better flushed out in their motion for summary judgment." (ECF No. 45, PAGEID # 864.) Parties who seek to raise new claims at the summary-judgment stage must first move to amend their pleadings under Federal Rule of Civil Procedure 15(a). *See Rafferty v. Trumbull Cnty.*, 758 F. App'x 425, 429 (6th Cir. 2018). If the plaintiff seeks to raise new claims for the first time in response to summary judgment, a district court does not err by refusing to consider them. *Tucker v. Union of Needletrades, Indus., & Textile Emps.*, 407 F.3d 784, 788 (6th Cir. 2005). Because the Court grants summary judgment to Defendants on other grounds, it need not plod through which allegations in Plaintiffs' summary judgment briefing were, or were not, included in the Amended Complaint.

8

## III. STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant has the burden of establishing there are no genuine issues of material fact, which may be achieved by demonstrating the nonmoving party lacks evidence to support an essential element of its claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). The burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56). When evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

A genuine issue exists if the nonmoving party can present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos.*, 8 F.3d 335, 339–40 (6th Cir. 1993). In other words, "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (concluding that summary judgment is appropriate when the evidence could not lead the trier of fact to find for the non-moving party).

9

IV. ANALYSIS

Though the parties seek summary judgment on several grounds, the Court will address only Defendants' arguments which are dispositive. The Court finds that: (1) some of the § 1983 claims are barred by the statute of limitations; (2) for those § 1983 claims that are not barred by the statute of limitations, Plaintiffs have failed to demonstrate that each Defendant, through his or her own actions, violated the Constitution; and (3) Directive 4.02 does not violate the Constitution. As to Plaintiffs' state law claims, the Court declines to exercise supplemental jurisdiction.

### A. The § 1983 claims brought by Ms. Thomas and Mr. Dillard are time-barred. Those brought by Ms. Dillard are not.

Defendants first argue that Plaintiffs' § 1983 claims accrued on July 19, 2019, and were time-barred when this action was filed on August 9, 2021. Plaintiffs argue in response that their claims did not accrue until August 7, 2019, and that, in any event, the continuing violations doctrine extended their time to file.

The Court looks to state law to determine the applicable statute of limitations, and federal law to determine when a cause of action accrues. *See Ruff v. Runyon*, 258 F.3d 498, 500 (6th Cir. 2001). "[T]he appropriate statute of limitations for actions under § 1983 is the statute of limitations applicable to personal injury actions." *Jones v. City of Hamtramck*, 905 F.2d 908, 909 (6th Cir. 1990). In Ohio, that statute of limitations is two years. *Banks v. City of Whitehall*, 344 F.3d 550, 553 (6th Cir. 2003) (citing Ohio Rev. Code § 2305.10). The statute of limitations "begins to run when plaintiffs knew or should have known of the injury which forms

10

the basis of their claims." *Ruff*, 258 F.3d at 500–501. The United States Supreme Court has explained:

> "Under the traditional rule of accrual . . . the tort cause of action accrues, and the statute of limitations commences to run, when the wrongful act or omission results in damages. The cause of action accrues even though the full extent of the injury is not then known or predictable." 1 C. Corman, Limitation of Actions § 7.4.1, pp. 526–527 (1991) (footnote omitted); *see also* 54 C.J.S., Limitations of Actions § 112, p. 150 (2005). Were it otherwise, the statute would begin to run only after a plaintiff became satisfied that he had been harmed enough, placing the supposed statute of repose in the sole hands of the party seeking relief.

*Wallace v. Kato*, 549 U.S. 384, 391 (2007). The Sixth Circuit directs courts to "look[ ] to what event should have alerted the typical lay person to protect his or her rights." *Kuhnle Bros., Inc. v. County of Geauga*, 103 F.3d 516 (6th Cir. 1997) (quoting *Dixon v. Anderson*, 928 F.2d 212, 215 (6th Cir. 1991)). The test is an objective one. Thus, courts do not evaluate whether a plaintiff had actual knowledge—instead, they evaluate whether the plaintiff "knew or should have known [of the injury] based upon reasonable inquiry, and could have filed suit and obtained relief." *Cooey v. Strickland*, 479 F.3d 412, 422 (6th Cir. 2007).

### 1. Ms. Thomas and Mr. Dillard's § 1983 claims accrued on July 19, 2019.

In the Fifth and Sixth Causes of Action, the Amended Complaint alleges that Defendants deprived Ms. Thomas and Mr. Dillard of their right to association with their sister by failing to timely notify them of important information and preventing them from seeing Ms. Dillard. (Am. Compl., ¶¶ 55, 61, 66, 67.) It further alleges that Defendants deprived Ms. Thomas and Mr. Dillard of their rights to contact Ms. Dillard's minister, or an attorney to advocate on her behalf. (*Id.*, ¶ 59.) The event

11

that should have alerted Ms. Thomas and Mr. Dillard of their potential claims against CDP occurred on July 19, 2019. That day, Ms. Thomas and Mr. Dillard learned that their sister had been shot and was hospitalized, but that CDP would neither disclose where she was being treated nor allow them to visit. Thus, the statute of limitations expired on July 19, 2021.

The continuous violation doctrine does not save the siblings' claims. That doctrine can apply to § 1983 claims, though in limited circumstances. *See Wilder v. Collins*, No. 2:12-cv-0064, 2012 WL 1606035, at *3 (S.D. Ohio May 8, 2012) (Graham, J.). The Sixth Circuit has explained,

> "A 'continuous violation' exists if: (1) the defendants engage in continuing wrongful conduct; (2) injury to the plaintiffs accrues continuously; and (3) had the defendants at any time ceased their wrongful conduct, further injury would have been avoided." *Hensley v. City of Columbus*, 557 F.3d 693, 697 (6th Cir. 2009). "A continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation." *Eidson v. Tenn. Dep't of Children's Servs.*, 510 F.3d 631, 635 (6th Cir. 2007).

*Broom v. Strickland*, 579 F.3d 553, 555 (6th Cir. 2009) (cleaned up). There is no evidence that Defendants in this case engaged in continued unlawful acts. Rather, the allegedly-wrongful acts all occurred on July 19—by the end of that day, Ms. Thomas and Mr. Dillard knew they were not allowed to visit or provide aid to Ms. Dillard, or even to know her location. Everything occurring after July 19 was a "continual ill effect" of CDP's original implementation of Directive 4.02. Because they did not file this action until August 9, 2021, Defendants' Motion for Summary Judgment is **GRANTED** as to Ms. Thomas and Mr. Dillard's § 1983 claims.

### 2. Ms. Dillard's § 1983 claims also accrued on July 19, 2019, but the statute of limitations was tolled until her death on August 9.

In the First and Sixth Causes of Action, the Amended Complaint alleges that Ms. Dillard was deprived of her right to association with family, her right to freedom of religion, and "possibly" her right to counsel. (Am. Compl., ¶¶ 26, 30, 64.) Ohio law tolls the statute of limitations if, "at the time the cause of action accrues, [the plaintiff is] of unsound mind." Ohio Rev. Code § 2305.16; *see Michelle R. v. Vill. of Middleport*, 2:19-cv-2272, 2019 WL 4452678, at *4 (S.D. Ohio Sept. 17, 2019) (Sargus, J.) ("Since Ohio's statute of limitations applies to section 1983 claims, so does its tolling statute, unless the result is inconsistent with federal law."). It is undisputed that Ms. Dillard was in a coma for all but a few hours of her hospitalization. As to Ms. Dillard's claims, then, the statute of limitations was tolled until her death on August 9, 2019. *Cf. Fetterolf v. Hoffmann-LaRoche, Inc.,* 661 N.E.2d 811 (Ohio Ct. App. 1995) (finding that death removed minor's "disability" tolling the statute of limitations). Accordingly, Ms. Dillard's § 1983 claims were timely filed.

### B. Detectives Brandt and Carney were not timely added as party-defendants.

Plaintiffs' original complaint named "John or Jane Doe" defendants who, though unknown at the time of the filing, were believed to become known during discovery. (*See* ECF No. 3, ¶ 6.) Plaintiffs replaced the Doe defendants with Detectives Brandt and Carney in the Amended Complaint, filed on January 19, 2022. (Am. Compl.) An amendment to a pleading relates back to the date of the

13

original pleading only in limited circumstances. *See* Fed. R. Civ. P. 15(c)(1). "Replacing a 'John Doe' defendant with a new, previously unknown party is considered a change of parties and must comply with the requirements of Rule 15(c)(1)(C) when the change is made after the expiration of the applicable statute of limitations." *Brown v. Cuyahoga Cty.*, 517 F. App'x 431, 433 (6th Cir. 2013). Plaintiffs do not (i) explain why Detectives Brandt and Carney were not named in the original complaint, (ii) argue that the Detectives has notice, or (iii) contend that the Detectives knew they would have been named but for some mistake. *See* Fed. R. Civ. P. 15(c)(1)(C). Accordingly, the Amended Complaint "created a new cause of action and there is no relation back to the original filing for purposes of limitations." *Asher v. Unarco Material Handling, Inc.*, 596 F.3d 313, 318 (6th Cir. 2010) (internal quotation and citation omitted).

Defendants' Motion for Summary Judgment is **GRANTED** as to Ms. Dillard's § 1983 claims against Detectives Brandt and Carney.

### C. Plaintiffs offer no evidence that Officers Bryant and Sauer are liable under § 1983 in their individual capacities.

To prevail on the remaining § 1983 claims against the individual officers, Ms. Dillard must demonstrate that each Defendant, through his own individual actions, has violated the Constitution—that is, she must prove "that the violation was committed *personally* by the defendant." *Robertson v. Lucas*, 753 F.3d 606, 615 (6th Cir. 2014). Here, the Estate has offered neither evidence nor argument that Officer Bryant or Officer Sauer personally engaged in any conduct that violated Ms. Dillard's constitutional rights. Instead, throughout their briefing, Plaintiffs

14

generically refer to conduct by "Defendants" and never identify any specific actions taken by either Officer to deprive Ms. Dillard of her rights. Accordingly, she has not demonstrated that either of these two individuals had direct responsibility for the challenged actions. Defendants' Motion for Summary Judgment is **GRANTED** on Ms. Dillard's § 1983 claims against Officers Bryant and Sauer.

### D. Plaintiffs offer no evidence that Directive 4.02 is unconstitutional.

The Amended Complaint names Defendant Elaine Bryant in her official capacity as Division Chief. It is well-established that "[a] suit against an individual in [her] official capacity is the equivalent of a suit against the governmental entity." *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) (citing *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)). The same is true with respect to administrative departments of governmental entities, such as CDP. *See Williams v. Dayton Police Dep't*, 680 F. Supp. 1075, 1080 (S.D. Ohio 1987) (Rice, J.). As a result, Plaintiffs' claims against Chief Bryant will be considered as claims against the City of Columbus.

To hold the City liable under § 1983, Ms. Dillard must show that the City's policy or custom caused her constitutional injury. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). There are four avenues to make out such a claim: (1) official policy or legislation; (2) action authorized by a designated decisionmaker; (3) failure to train or supervise employees; or (4) a custom of acquiescence in rights violations. *Jackson v. City of Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019). Ms. Dillard proceeds

15

under the first avenue, arguing that the implementation of Directive 4.02[9] deprived her of her constitutional rights because CDP used the Directive to justify the no-visitation policy.

Ms. Dillard had been arrested and was considered to be in pretrial detention while hospitalized. Pretrial detainees do not possess the full range of freedoms that unincarcerated individuals hold. *Bell v. Wolfish*, 441 U.S. 520, 546 (1979). Restrictions placed on pretrial detainees are constitutional so long as they do not amount to punishment or otherwise violate the Constitution. *Id.* at 535–37. "A court must decide whether the [restriction] is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose." *Id.* at 538.

> [I]f a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to 'punishment.' Conversely, if a restriction or condition is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the governmental action is punishment . . . .

*Id.* at 539; *see also Block v. Rutherford*, 468 U.S. 576, 584 (1984) (upholding a detention facility's ban on contact visits with pretrial detainees in view of the policy's "obvious" connection to internal security). In the absence of "substantial

---

[9] In addition to Directive 4.02, Plaintiffs' Motion for Summary Judgment references "other department policies and procedures." (ECF No. 41, PAGEID # 734.) But Plaintiffs never identify any other policy or procedure at issue for the *Monell* claims. *See Graham v. Cty. of Washtenaw*, 358 F.3d 377, 383 (6th Cir. 2004) ("A plaintiff asserting a section 1983 claim on the basis of a municipal custom or policy must 'identify the policy, connect the policy to the [City] itself and show that the particular injury was incurred because of the execution of that policy.'") (quoting *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993), *cert. denied*, 510 U.S. 1177 (1994)).

evidence" indicating that law enforcement officials "have exaggerated their response" to legitimate interests, "courts should ordinarily defer to [those officials'] expert judgment" regarding restrictions during pretrial detention. *Bell*, 441 U.S. at 539.

This Court is certainly troubled by the facts in this case—in particular, the duration and circumstances surrounding CDP's application of Directive 4.02. *See Bell*, 441 U.S. at 543 (finding the duration of the restriction relevant to its constitutionality). Ms. Dillard was admitted to Mount Carmel East Hospital on July 19, 2019. She was never expected to survive her injuries, and was under near-constant sedation. But it was not until 19 days had passed that CDP informed the family of her location and permitted visitation. It is beyond belief that CDP could not have made some reasonable accommodation to allow controlled visitation by family—and, if requested by the family, spiritual and legal advisors. (To state the obvious, Ms. Dillard could not have been expected to request an attorney herself.) But, with that being said, Plaintiffs do not argue that the restrictions on Ms. Dillard's visitation amounted to punishment. Nor do they dispute the Division's reasons behind Directive 4.02—including to mitigate security and intelligence risks.

- *Security risk*. Defendants state that Directive 4.02 "is necessary for the security of the prisoner as well as the security of the citizens in the area." (ECF No. 36-9, PAGEID # 476.) A community hospital is an unsecured area requiring precautions to ensure the safety of detainees, officers, hospital personnel, and members of the public. Security is "perhaps the most legitimate" governmental objective. *Overton v. Bazzetta*, 539 U.S. 126, 133 (2003).

- *Intelligence risk*. Further, CDP wanted to interview Ms. Dillard before she spoke to any other potential witnesses. (*See* ECF No. 36-9, PAGEID # 476.) Obtaining an uncontaminated statement from a pretrial detainee

17

> may be a legitimate governmental interest. *Cordova v. City of Albuquerque*, No. 11-806 GBW/ACT, 2013 WL 12033330, at *6 (D. N.M. May 21, 2013).

Thus, despite the Court's concerns, Plaintiffs have not provided any reason why the Court should not defer to the Division's expert judgment regarding the restrictions placed on Ms. Dillard.

Defendants' Motion for Summary Judgment is **GRANTED** as to Ms. Dillard's § 1983 claims against the City.

### E. The Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims.

Having granting judgment to Defendants on all of Plaintiffs' federal claims, the Court declines to exercise supplemental jurisdiction over their state law claims. Federal courts are "courts of limited jurisdiction" that "possess only that power authorized by Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). Once a court has original jurisdiction over some claims in the action, it can exercise supplemental jurisdiction over additional claims that are part of the same case or controversy. *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966). But supplemental jurisdiction "need not be exercised in every case in which it is found to exist"—doing so is a matter of judicial discretion. *Id.* at 726. Here, exercising supplemental jurisdiction over Plaintiffs' state law claims would not serve judicial economy, convenience, fairness, or comity, and the Court declines to do so. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988).

Plaintiffs' state law claims are **DISMISSED without prejudice** to refiling in state court.

18

## V. CONCLUSION

For the reasons set forth above, Defendants' Motion for Summary Judgment (ECF No. 36) is **GRANTED** and Plaintiffs' Motion for Summary Judgment (ECF No. 41) is **DENIED**. Plaintiffs' state law claims are **DISMISSED without prejudice** to refiling in state court.

**IT IS SO ORDERED.**

/s/ Sarah D. Morrison
**SARAH D. MORRISON**
**UNITED STATES DISTRICT JUDGE**